**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

C.W. and K.W., individually and on behalf of their minor son, BILLY ROE,

       Plaintiffs,

v.

MANASQUAN BOARD OF EDUCATION; *et al.*,

       Defendants.

Civil Action No. 21-20680 (GC)

**OPINION**

---

**CASTNER, District Judge:**

    This matter has been opened to the Court by a motion to dismiss brought by Defendants Manasquan Board of Education ("MBOE"), Manasquan School Board Officers & Members ("School Board"), Manasquan Elementary School ("MES") (collectively with the MBOE and School Board, "Manasquan Defendants"), and numerous MBOE officers, members, and employees,[1] in their individual and official capacities (collectively with the Manasquan Defendants, "Defendants"). Defendants seek partial dismissal of the Complaint filed by Plaintiffs C.W. and K.W., individually and on behalf of their minor son, Billy Roe ("Billy") (collectively with C.W. and K.W., "Plaintiffs"), which asserts claims for common law negligence and violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-1 *et. seq.*; the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-2, *et. seq.*; and 42 U.S.C. § 1983;

---

[1]     The individual defendants include Eugene Cattani, Jr. ("Cattani"), Dr. Frank Kasyan ("Dr. Kasyan"), Colleen Graziano ("Graziano"), Richard Kirk ("Kirk"), Anthony Cinelli ("Cinelli"), Margaret Polak ("Polak"), Theresa Savage ("Savage"), Justin Roach ("Roach"), and Brian McCann ("McCann") (collectively, the "Individual Defendants").

arising from Defendants' conduct related to incidents of harassment, intimidation, bullying, and violations of Billy's freedom of speech while Billy was a student at MES.

For the reasons explained in this Opinion, Defendants' partial motion to dismiss the Complaint is **GRANTED** in part and **DENIED** in part. With respect to Plaintiffs' negligence claim (Count One), Defendants' motion is granted as to Mr. Cattani, Dr. Kasyan, Ms. Polak, and Mr. Roach, but denied as to Ms. Savage. As to Plaintiffs' hostile educational environment claim under the NJLAD (Count Two), Defendants' motion is granted as to the Individual Defendants, but denied as to the Manasquan Defendants. Defendants' motion is also granted as to Plaintiffs' retaliation claim under the NJLAD (Count Three). Finally, Defendants' motion is granted as to Plaintiffs' claim for violation of Billy's First Amendment under § 1983 and *Monell* claim (Count Five), but it is denied as to Plaintiffs' claim for state-created danger (Count Six).

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The relevant facts are derived from the Complaint and assumed true for the purposes of this motion. Billy, who was fourteen years old at the time Plaintiffs filed the Complaint, was born on June 14, 2007. (ECF No. 1 ("Compl."), ¶ 7.) According to the Complaint, Billy was diagnosed with Asperger's Syndrome when he was two years old, and he was later diagnosed with attention deficit hyperactivity disorder (ADHD) and attention deficit disorder (ADD). (*Id.* at ¶ 65.) The alleged incidents of discrimination, bullying, intimidation, and harassment that are detailed in the Complaint began when Billy was approximately eight years old, while he attended Manasquan Elementary School. (*Id.* at ¶ 7.)

### A.  Allegations of Bullying, Discrimination, and Abuse Between 2015 and 2020

First, C.W. and K.W. allege that in 2015, they complained about a teacher who, upon information and belief, was a prominent figure in the Manasquan School District. (*Id.* at ¶ 23.) According to Billy's parents, their complaints were "met with nothing but opposition from the

2

School and the School District." (*Id.* at ¶ 24.) Despite the School District's purported dismissal of their concerns, Plaintiffs continued to object to and complain about the "mishandling of their son and his educational needs" to no avail. (*Id.* at ¶ 25.)

Additionally, Plaintiffs allege that from approximately 2015, until Billy left the school district in 2020, he experienced an "extremely hostile educational environment." (*Id.* at ¶ 27.) In that regard, the Complaint alleges numerous examples from Billy's time in the Manasquan School District, which include incidents of physical abuse, verbal abuse, and bullying. Specifically, Plaintiffs allege that in 2016, Mr. McCann physically assaulted Billy in the lunchroom as he played with a toy. (*Id.* at ¶ 29.) According to Plaintiffs, Mr. McCann "stormed over to Plaintiff and grabbed both of his wrists and shook them until the toy fell out of Plaintiff's hand and onto the floor." (*Id.* at ¶ 30.) Although C.W. and K.W. complained about the incident, the school district purportedly took no action. (*Id.* at ¶ 31.)

In 2017, Plaintiffs allege that an incident occurred involving Billy and another student that resulted in an argument. (*Id.* at ¶ 32A.) The Child Study Team ("CST") allegedly wanted to interview Billy regarding the argument, but Billy indicated that he did not want to speak to the members of the CST until his mother and father were present. (*Id.*) According to Plaintiffs, however, Billy's parents were not contacted, and instead Ms. Savage blocked the door so Billy could not leave. (*Id.*) The Complaint further alleges that Ms. Savage told Billy he could not go to the bathroom or get a drink of water unless he first spoke with the CST about the incident. (*Id.*) In a separate incident from 2017, Plaintiffs allege that Billy returned home from school one day with a paper containing Post-It Notes that included a total of seventy-two check marks. (*Id.* at ¶ 32B.) According to the Complaint, these check marks represented an outburst that Billy had that day; however, C.W. and K.W. were informed by Billy's teachers that he had a "good day." (*Id.*)

Similarly, in 2018, Mr. McCann allegedly "spent most of the days watching Plaintiff Billy Roe and writing down, in a little black notebook, every move Plaintiff made throughout the school day." (*Id.* at ¶ 32D.) According to Plaintiffs, Mr. McCann's conduct, combined with the Post-It Note incident, made Billy feel as if he was "under a microscope, and it felt hostile." (*Id.* at ¶ 32E.)

As for 2019, the Complaint alleges approximately ten separate incidents of physical abuse, verbal abuse, and bullying by other students at the school directed at Billy. (*Id.* at ¶¶ 32G-N.) By way of example, during a school band trip on May 31, 2019, Plaintiffs allege that a student punched and kicked Billy's seat from behind, continuously ridiculed him in front of other students, and posted negative comments in response to Billy's pictures on Instagram. (*Id.* at ¶ 32H.) On the way home from that same trip, Plaintiffs allege that the student continued to physically and verbally abuse Billy and told him that he had been to the principal's office five times that year because of Billy and never got in trouble. (*Id.*)

On September 23, 2019, Plaintiffs further allege that students arranged an afterschool meeting with Billy at a park where he was met by approximately ten students to fight and provoke him, including a female student who attempted to hit him. (*Id.* at ¶ 32I.) According to Plaintiffs, upon information and belief, one of the primary bullies from the incident was not investigated or disciplined by MES, and the student later bragged that the school district did nothing about his misconduct towards Billy. (*Id.*)

Plaintiffs also allege that in late September 2019, "school representatives" allowed classmates to sing a derogatory song directed at Billy, praying on his disabilities, to provoke him. (*Id.* at ¶32J.) Similarly, Plaintiffs aver that on September 30, 2019, in a separate incident, students in Billy's math class sang a derogatory song directed at Billy. (*Id.* at ¶ 32K.) According to Plaintiffs, one of Billy's classmates, T.C., repeatedly said Billy's name to taunt him and kicked his

chair. Billy "act[ed] out" to defend himself, which resulted in Billy being suspended for three weeks and requiring psychological clearance before he could return to school. (*Id.*) Plaintiffs claim that upon return from this suspension, two more bullying incidents occurred off school grounds and another occurred inside the school. (*Id.* at ¶ 32L.) As for the incident at MES, Plaintiffs claim that T.C. told Billy, in front of a classroom observer, "We all did better at math because you were not here." (*Id.* at ¶¶ 32L-M.) According to Plaintiffs, Assistant Principal Kirk was informed of these incidents, but he ignored and/or refused to consider Billy's account and any related evidence, nor did he provide any of the evidence to Mr. Cinelli, the school's Counselor and Anti-Bullying Specialist. (*Id.* at ¶ 32L.)

Later, on December 16, 2019, Plaintiffs allege that the same group of students that had previously bullied Billy, bullied him at the local library. (*Id.* at ¶ 32O.) According to Plaintiffs, the students mocked the size of Billy's genitals and called him "gay." (*Id.*) During this same incident, Plaintiffs claim that a female student tried to provoke Billy to hit her by, among other things, telling him that he needs to get a bra, asking him to be in their drag show, and telling him to cut off his nipples and act like a man. (*Id.*) Plaintiffs allege that Defendants were provided with an audio of the female student's comments and found them not to be discriminatory or sexually harassing, and therefore, no action was taken. (*Id.*) That same day, another student called Billy a racist via text message, a comment that had been spread by students for nearly a year, but the school district purportedly did nothing "meaningful" to address the behavior. (*Id.* at ¶ 32P.)

**B.** **Alleged Infringement of Billy's First Amendment Rights**

In addition to the bullying and harassment allegations, the Complaint also alleges two incidents that, according to Plaintiffs, infringed on Billy's First Amendment right to the freedom of speech. In that regard, Plaintiffs allege that in 2017, Billy was prohibited from talking about

President Donald Trump for a class assignment, because "school staff" told him that doing so would be "insensitive to other students in the class." (*Id.* at ¶¶ 69-71.) Billy's parents complained to "school staff," but their complaints were purportedly ignored. (*Id.* at ¶ 72.)

In a separate incident in December 2017, a teacher allegedly scolded Billy because he spoke about Jesus and Jesus' significance to Christmas, when the teacher instructed him not to talk about Jesus. (*Id.* at ¶¶ 73-74.) According to Plaintiffs, around this same time, Billy completed a school project that included a religious symbol; however, unlike the projects of other students in Billy's class, who also included religious symbols in their projects, the teacher did not display Billy's project in the classroom. (*Id.* at ¶¶ 75-76.) Billy's parents complained to the teacher about this decision, but "the complaint went nowhere." (*Id.* at ¶ 77.) Finally, in 2018, Billy was scolded for not participating in the "Buddhist prayer bowl ritual" during morning exercises. (*Id.* at ¶ 78.) He was also reprimanded and removed from an in-class lesson when he commented that, "our country is a constitutional Republic and not a Democracy." (*Id.* at ¶ 80.)

### C.   Reporting of Harassment and Bullying to the School's Anti-Bullying Specialist, Allegations of the District's Non-Action, and Continued Abuse After Leaving the School District

In December 2019, Billy reported the multiple incidents of harassment, intimidation, and bullying to Mr. Cinelli. (*Id.* at ¶ 33.) In addition to the specific examples set forth above, the majority of these bullying incidents reported to Mr. Cinelli involved Billy being "taunt[ed] and harass[ed] […] about his gender and sexual orientation." (*Id.* at ¶ 34.) Specifically, the Complaint alleges that Billy was called "gay," and a variety of other homophobic slurs, so many times that he "began to get confused about his own sexuality." (*Id.* at ¶ 38.) According to Plaintiffs, Mr. Cinelli dismissed Billy, telling him that he believed Billy was "out to get" the alleged bullies. (*Id.*

at ¶ 33.) Plaintiffs further allege that Mr. Cinelli did not perform an investigation, despite that being his job as Manasquan Elementary School's Anti-Bullying Specialist. (*Id.*)

In response to the years of alleged bullying, Billy began "exhibiting symptoms of suicidal ideation, depressions and anxiety." (*Id.* at ¶ 43.) As a result, Billy did not return to school after the holiday break in January 2020. (*Id.* at ¶ 44.) Instead, Billy's parents placed him in "Partial Hospitalization Therapy." (*Id.* at ¶ 45.)

Despite not attending MES in 2020, Plaintiffs allege that the bullying of Billy continued. According to Plaintiffs, on January 10, 2020, Billy was taunted by students from his grade for not attending school while he walked home from a local park. (*Id.* at ¶ 46.)

### D.   Commencement of this Action and Procedural History

On December 22, 2021, Plaintiff filed the Complaint, asserting seven causes of action against Defendants: (1) negligence (Count One); hostile educational environment (Count Two) and retaliation (Count Three) in violation of the NJLAD; violation of Billy's First Amendment rights under the U.S. Constitution, pursuant to 42 U.S.C. § 1983 (Count Four); a *Monell* claim for unlawful custom or policy and failure to train and supervise, pursuant to 42 U.S.C. § 1983 (Count Five), state created danger, pursuant to 42 U.S.C. § 1983 (Count Six), and violation of the New Jersey Constitution and NJCRA (Count Seven). (*See, e.g.*, Compl.)

On March 4, 2022, Defendants filed the instant partial motion to dismiss (ECF No. 4 ("Def. Mov. Br."), which Plaintiffs opposed on April 15, 2022. (ECF 11 ("Pl. Opp.").) Defendants filed a reply brief on April 25, 2022. (ECF No. 12 ("Def. Reply").)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to

dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)); *Haney v. USA Gymnastics, Inc.*, No. 21-07213, 2022 WL 909871, at *2 (D.N.J. Mar. 29, 2022). When reviewing a motion to dismiss for failure to state a claim, courts first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). While Federal Rule of Civil Procedure 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).

## III.   **DISCUSSION**

On this motion, Defendants move to partially dismiss Plaintiffs' claims for negligence (Count One), hostile educational environment and retaliation under the NJLAD (Counts Two and Three), violation of 42 U.S.C. § 1983 (Counts Four, Five, and Six), and violation of the NJCRA

(Count Seven). In addition, Defendants argue that Plaintiffs' request for punitive damages is inappropriate and should be struck. The Court will address Defendants' arguments, in turn.

### A.    Negligence (Count One)

First, Defendants argue that to the extent that the Complaint asserts a claim of negligence in Count One based on a "non-delegable duty" to supervise students and protect Billy, as well as a failure to implement and enforce proper policies and procedures regarding bullying and discrimination, that portion of Count One should be dismissed. (Def. Mov. Br., 34-35.) Although Defendants acknowledge that the Manasquan Defendants stand in the shoes of the parents while a student is present at school, it submits that "the relationship of *in loco parentis* does not impose a non-delegable duty that would warrant imposition of liability for a student's misconduct towards plaintiff." (*Id.* at 35.)

Here, because the New Jersey Supreme Court has "consistently applied traditional principles of due care and foreseeability to cases involving *in loco parentis* relationships, rather than adopting a "non-delegable" or absolute duty," the Court agrees with Defendants' position. *Davis v. Devereux Found.*, 209 N.J. 269, 289 (2012). Rather, it is well-settled that "[s]chool officials have a general duty 'to exercise reasonable supervisory care for the safety of students entrusted to them, and [are accountable] for injuries resulting from failure to discharge that duty.' " *Jerkins v. Anderson*, 191 N.J. 285, 296 (2007) (alteration in original) (quoting *Caltavuturo v. Passaic*, 124 N.J. Super. 361, 366 (App. Div.), *certif. denied*, 63 N.J. 583 (1973)). In *Jerkins*, the Supreme Court considered whether school officials had a duty to provide such supervision to a third-grade student who left school grounds without an adult after an early dismissal and was seriously injured when struck by a car several hours later. *Id.* at 289–90. The Court concluded that

the scope of the duty was "defined by a standard of reasonableness." *Id.* at 301. However, the Court also cautioned that the duty of care had practical limits:

> Our holding should not be interpreted to suggest that schools are guarantors of students' safety with respect to all activities during or after dismissal. A school district's responsibility has temporal and physical limits, and its obligation to act reasonably does not diminish the responsibilities [of others].

*Id.* at 306.

Next, Defendants argue that Plaintiffs' negligence claim should be dismissed as to Mr. Cattani, Dr. Kasyan, Ms. Polak, Mr. Roach, and Ms. Savage, because no direct allegations involving those individuals have been asserted. (Def. Mov. Br., 36-37.) In response, Plaintiffs maintain simply that the Complaint sufficiently pleads facts and omissions related to these five individual defendants to support a negligence claim, because Plaintiffs "explicitly included each of the 5 Defendants in the term 'MBOE Defendants.'" (Pl. Opp., 38-39.) In that regard, Plaintiffs highlight that the Complaint alleges the MBOE Defendants "acted negligently and/or grossly negligently" by "fail[ing] to properly protect students within their supervisory control, "fail[ing] to properly supervise students, and "fail[ing] to take appropriate measures in response to allegations of bullying, intimidation, harassment, and/or physical abuse of students. (*Id.*) (citing Compl., ¶ 82.)

Here, because the Complaint fails to allege any direct actions or omissions by Mr. Cattani, Dr. Kasyan, Ms. Polak, and Mr. Roach, Plaintiffs' negligence claim is dismissed without prejudice as to those defendants. *Bullock v. Ancora Psychiatric Hosp.*, No. 10–1412, 2011 WL 3651352 at *11 (D.N.J. Aug. 18, 2011) (granting motion to dismiss plaintiff's negligence claim because complaint did not "allege facts sufficient to establish that [individual defendants] breached a duty of care . . . or any specific act[s] or omissions by those [d]efendants that proximately caused [the plaintiff's] injuries"). In *Bullock*, the plaintiff attempted to assert a negligence claim against certain

individuals in connection with medical care received at a state-run psychiatric hospital. No. 10–1412, 2011 WL 3651352 at *1-2 In partially granting the defendants' motion to dismiss, the court determined that the plaintiff failed to allege facts sufficient to establish that four individual defendants breached a duty of care, because the plaintiff merely alleged that those individual defendants were "generally responsible for [the] [p]laintiff's welfare." *Id.* at *11. The court reasoned that dismissal was warranted because the plaintiff did not explain the scope of the individual defendants' responsibilities related to the plaintiff, nor did the plaintiff allege any specific act or omissions by those individual defendants that proximately caused the plaintiff's injuries. *Id.* Specifically, the court noted that "[i]In essence, Plaintiff alleges only that they were generally responsible for patients' welfare because they treated and served Ancora patients," which is insufficient. *Id.*

The same is true, here. Indeed, other than being identified as named defendants and setting forth their respective job titles, the Complaint does not reference either of these four individual defendants, let alone provide meaningful factual allegations to support a *prima facie* claim of negligence. In that connection, Plaintiffs' attempt to circumvent the pleading standard by arguing that their general allegations related to the "MBOE Defendants" encompass Mr. Cattani, Dr. Kasyan, Ms. Polak, and Mr. Roach, is unpersuasive.

As to Ms. Savage, however, the Court finds that the Complaint provides sufficient factual allegations to sustain a negligence claim. The Complaint alleges that Ms. Savage, MES' psychologist, was involved in an incident that occurred in 2017, between Billy and another student. (Compl., ¶ 32A.) In that regard, the Complaint alleges that Billy and a fellow student got into an argument, which resulted in the CST requesting to interview Billy. (*Id.*) According to the Complaint, Billy indicated that he did not wish to speak with the CST regarding the argument until

C.W. and K.W. were present. (*Id.*) Plaintiffs allege, however, that C.W. and K.W. were never contacted, and instead, Ms. Savage "blocked the door so Billy Roe could not leave and told Billy Roe he could not go to the bathroom or get a drink of water unless he first talked to the CST people about the incident." (*Id.*) Based on these allegations of direct action, the Court concludes that Plaintiffs have sufficiently pled a negligence claim against Ms. Savage.

Accordingly, Defendants' motion to dismiss the negligence claim in Count One is denied as to Ms. Savage, but it is granted as to Mr. Cattani, Dr. Kasyan, Ms. Polak, and Mr. Roach. Count One is dismissed without prejudice as to those individual defendants.

### B. Hostile Educational Environment and Retaliation Under New Jersey Law Against Discrimination (Counts Two and Three)

Defendants also move to dismiss Counts Two and Three of the Complaint, which assert claims under the NJLAD for hostile educational environment and retaliation.

#### 1. Hostile Educational Environment

In Count Two, Plaintiffs allege that Defendants subjected Billy to a hostile school environment based on the harassment and bullying he endured in connection with his diagnosed mental disabilities and perceived sexual orientation. Defendants, however, argue that Plaintiffs' claim should be dismissed because (1) the Complaint lacks factual allegations to show that Billy would not have been harassed "but for" his disability, *i.e.*, Asperger's Syndrome, ADHD, or ADD, (2) any harassment regarding Billy's sexual orientation was brief and occurred after he had left the school district, and (3) the Individual Defendants are not "employers" within the intendment of the NJLAD.

The NJLAD provides that:

> All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property

> without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression or source of lawful income used for rental or mortgage payments, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.

N.J. Stat. Ann. § 10:5–4. The NJLAD's protections apply to public school students. N.J. Stat. Ann. § 10:5–5; *see also L.W. ex rel. L.G. v. Toms River Regional Sch. Bd. of Educ.*, 189 N.J. 381, 405 (2007) (finding that the NJLAD "applies universally to 'places of public accommodation,' a defined term that includes schools regardless of their source of funding"). However, a school cannot be expected to shelter students from all instances of peer harassment. *L.W.*, 189 N.J. at 406. "[I]solated schoolyard insults or classroom taunts are not actionable." *Id.* at 402. Rather, to state a hostile school environment claim under the NJLAD, an aggrieved student must allege (1) "discriminatory conduct that would not have occurred 'but for' the student's protected characteristic," (2) "that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and" (3) "that the school district failed to reasonably address such conduct." *Id.* at 402-03.

Here, the Court disagrees with Defendants' position. First, with respect to Billy's mental disabilities, the Complaint alleges that he was diagnosed with Asperger's Syndrome, ADD, and ADHD when he was two years old, and that the bullying, harassment, and hostile educational environment that he endured was, at least in part, due to his disabilities. (Compl., ¶¶ 65, 108.) As an example, the Complaint alleges that in September 2019, Billy's classmates "sang a derogatory song directly targeting him, with the goal of provoking him to get upset, *i.e.*, to 'break' him." (*Id.* at ¶ 32J.) According to Plaintiffs, "these peers were aware of and deliberately playing upon his disabilities, and School representatives were allowing same to unfold and go unchecked." (*Id.*)

Moreover, the Court is satisfied, at this juncture, that there are sufficient facts pled to support Plaintiffs' NJLAD claim for hostile educational environment based on harassment Billy received as a result of his perceived sexual orientation. According to the Complaint, Billy was subject to numerous derogatory comments about his perceived sexuality, including but not limited to asking Billy to "cut off [his] nipples and start acting like a man;" offensively asking Billy to participate in a "drag show;" and repeatedly being called homosexual slurs like "gay," "fag," and "queen." (*Id.* at ¶¶ 36-37, 96.) In fact, the Complaint alleges that this behavior was so constant that Billy "began to get confused about his own sexuality." (*Id.* at ¶ 38.) As such, when construing the Complaint in Plaintiffs' favor, Plaintiffs assert a cognizable claim under the NJLAD for hostile environment against the Manasquan Defendants.

Turning to the Individual Defendants, "[a] school is liable for a hostile school environment when it grants a supervisor authority to control the school environment and the supervisor either abuses that authority or has actual or constructive knowledge of the harassment and fails to take effective measures to end the discrimination." *Joyce v. City of Sea Isle City*, No. 04–5345, 2008 WL 906266, at * 23 (D.N.J. Mar. 31, 2008). In evaluating the adequacy of the school's response to peer harassment, the factfinder "must determine the reasonableness of a school district's response to peer harassment in light of the totality of the circumstances." *L.W.*, 189 N.J. at 551. However, the New Jersey Supreme Court has held that "an individual within a public entity can only be held liable under the NJLAD as an 'aider or abettor." *Doe v. Schwerzler*, No. 06–3529, 2008 WL 4066338, at *5 (D.N.J. Aug. 27, 2008). In order to be held liable as an aider and abettor, the New Jersey Supreme Court has explained that a plaintiff must show that: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an illegal or tortious activity at the time that he provides the

assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Tarr v. Ciasulli*, 181 N.J. 70, 853 A.2d 921, 928 (2004) (internal quotations and citations omitted). In order to determine whether a defendant provided "substantial assistance," a court may consider: (1) the nature of the act encouraged; (2) the amount of assistance provided by the defendant; (3) whether defendants was present at the time of the alleged harassment; (4) the defendant's relations to the others; and (5) the defendant's state of mind. *Id.* Moreover, "with regard to supervisor liability, a supervisor has a duty to act against unlawful gender-based harassment ... Therefore, a supervisor can be individually liable when he breaches this duty through deliberate indifference to the harassing conduct ... Individual liability, however, even in the context of failure to act, 'require [s] active and purposeful conduct." *Schwerzler*, No. 06–3529, 2008 WL 4066338, at \*5 (citations and quotations omitted).

Here, as detailed above, the Complaint alleges the wrongful conduct at issue was the Manasquan Defendants' deliberate indifference to ongoing harassment related to Billy's disabilities and perceived sexual orientation by other students. Specifically, Plaintiffs allege that despite numerous complaints made by C.W. and K.W., as well as promises by the Manasquan Defendants to investigate some of the specific incidents of alleged bullying and harassment, those complaints were not addressed, and the harassment continued. (*See* Compl., ¶¶ 48–50.) However, Plaintiffs have not alleged sufficient facts to support the requirements of aiding and abetting. Because Plaintiffs have pled no factual allegations concerning the Individual Defendants' "active and purposeful" support of the harassing behavior, there is no factual basis that would permit this Court to draw a reasonable inference that the Individual Defendants were liable for aiding and abetting under NJLAD. *See M.H. by D.H. v. C.M.*, No. 20-01807, 2020 WL 6281686, at \*8 (D.N.J. Oct. 27, 2020) (granting defendants' motion to dismiss a plaintiff's hostile educational

environment claim asserted against school employees because the complaint lacked allegations of active and purposeful support to sustain aiding and abetting liability). Thus, Plaintiffs' claim against the Individual Defendants for hostile environment under the NJLAD is dismissed without prejudice.

2.  Retaliation

In Count Three, Plaintiffs assert a claim for retaliation under the NJLAD. Defendants argue that dismissal is warranted because the Complaint does not allege that Billy was subjected to any adverse educational decisions, *i.e.*, detention, suspension, etc., for reporting students' harassing and/or discriminating conduct. In that regard, Defendants contend that Plaintiffs have not alleged Billy was denied any "accommodation, advantage, facility, or privilege" based on a protected class under the NJLAD. Rather, Defendants submit that it was Billy's parents that decided to remove him from MES.

In New Jersey, "the *prima facie* elements of a retaliation claim under the LAD require[ ] plaintiff to demonstrate that: (1) plaintiff was in a protected class; (2) plaintiff engaged in protected activity known to the employer; (3) plaintiff was thereafter subjected to an adverse employment consequence; and (4) that there is a causal link between the protected activity and the adverse employment consequence." *Victor v. State*, 203 N.J. 383, 4 A.3d 126, 408–09 (2010); N.J. Stat. Ann. § 10:5–1 *et seq.*

Here, the Court agrees with Defendants' position. The Complaint does not allege that Defendants took any adverse action against Plaintiffs. Indeed, in addition to being vague, the mere allegation that "the MBOE Defendants ignored [C.W. and K.W.'s] complaints or took steps to make them worse" does not constitute retaliation under the NJLAD. (Compl., ¶ 25.) Further, to the extent that Plaintiffs allege that C.W. and K.W.'s decision to remove Billy from the school district

constitutes an adverse action, the Court is unpersuaded. Regardless of the reason for Billy's

relocation, the allegations are clear that it was C.W. and K.W. who removed Billy, <u>not Defendants</u>.

Thus, Plaintiffs' claim for retaliation under the NJLAD is dismissed without prejudice.

C.    <u>Section 1983 Claims (Counts Four, Five, and Six)</u>[2]

Third, Defendants move to dismiss Counts Four through Six of the Complaint, which assert

claims pursuant to § 1983 based on purported violations of Billy's constitutional rights under the

First Amendment and his "right to equal access to education and to be free from intrusions into his

personal privacy and bodily and emotional integrity."

Section 1983 provides a cause of action for an individual whose constitutional or federal

rights are violated by those acting under color of state law:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "To establish valid claims under § 1983, the plaintiff must demonstrate that the

defendants, while acting under color of state law, deprived him of a right secured by the

Constitution or the laws of the United States." *Shuman ex rel Shertzer v. Penn Manor School Dist.*,

422 F.3d 141, 146 (3d Cir. 2005) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir.

1995); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("By the plain terms of § 1983, two—

---

[2]    Courts in New Jersey view the NJCRA as analogous to § 1983, *see, e.g., Hedges v. Musco*, 204
F.3d 109, 121 n.12 (3d Cir. 2000); *Van Tassel v. Ocean Cty.*, No. 16-4761, 2017 WL 5565208, at *6 (D.N.J.
Nov. 17, 2017); *Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016); *Hottenstein
v. City of Sea Isle City*, 977 F. Supp. 2d 353, 365 (D.N.J. 2013); *Trafton v. City of Woodbury*, 799 F. Supp.
2d 417, 443 (D.N.J. 2011). Accordingly, Plaintiffs' NJCRA claims will be interpreted analogously to their
§ 1983 claims. *Trafton*, 799 F. Supp. 2d at 443–44; *see Hedges*, 204 F.3d at 121 n.12 (concluding New
Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth
Amendment).

and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law.").

### 1. First Amendment (Count Four)

In Count Four, Plaintiffs allege that Defendants violated Billy's First Amendment rights by interfering with his political and religious beliefs. (*See* Compl., ¶¶ 117-18.) To sustain a First Amendment retaliation claim under § 1983, Plaintiffs must establish that "(1) they engaged in a constitutionally protected activity; (2) they were subjected to retaliatory action; (3) there was a causal link between the plaintiffs' constitutionally protected activity and the defendant's retaliatory action." *Haytas v. Bayonne Bd. of Educ.*, No. 13-7676, 2015 WL 6739115, at *3 (D.N.J. Nov. 4, 2015); *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 863 (3d Cir. 2019). To establish a causal nexus, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Rink v. Ne. Educ. Intermediate Unit 19*, 717 Fed. Appx. 126, 133 (3d Cir. 2017) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). If a plaintiff satisfies the three-part test, the government thereafter bears the burden of showing that it would have taken the adverse action even if Plaintiffs had not engaged in the protected speech. *See Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019).

Critically, the Court notes that while governmental entities, like the Manasquan Defendants, may be liable under § 1983, they cannot be held liable under a theory of *respondeat superior. See Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of N.Y.C.*, 436 U.S. 658, 690-91 (1978)). Rather, Plaintiffs must show that the

defendant was personally involved in violating their rights. *Ashcroft*, 556 U.S. at 676 (holding that plaintiffs must show that "each Government-official defendant, through the official's own individual actions, has violated the Constitution"). "Personal involvement 'can be shown through allegations of personal direction or of actual knowledge and acquiescence.' " *Hayes v. Gilmore*, No. 18-2289, 2020 WL 550735, at *2 (3d Cir. Feb. 4, 2020) (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)). In the Third Circuit, "knowledge and acquiescence" in this context requires a defendant to have actual, personal knowledge of the violation—constructive knowledge does not suffice. *See Chavarriaga v. New Jersey Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005). In addition, while a governmental entity may not be sued under § 1983 for an injury inflicted solely by its employees or agents, it "may only be held liable under § 1983 if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Twp.*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. at 694).

Here, the Court finds that Plaintiffs fail to identify any personal involvement by a named defendant that would subject them to § 1983 liability for an alleged violation of Billy's First Amendment rights, nor do they allege the existence of a policy, practice, or custom that resulted in that same infringement of rights. Specifically, as Defendants highlight, the Complaint only vaguely references "school staff" or a "teacher" that purportedly infringed Billy's right to free speech. (*See* Compl., ¶¶ 69-80.) Since none of the named Individual Defendants or the Manasquan Defendants are alleged to have taken direct, personal adverse action against Billy for expression of speech, the only way that Plaintiffs could sufficiently state a claim against the Manasquan Defendants would be to allege that a policy, practice, or custom motivated those unidentified teachers and school staff to violate Billy's First Amendment rights. In that regard, while the

Complaint generally uses the words "policy," "practice," and "custom," the Court finds that Plaintiffs fail to allege any specific policy, practice, or custom nor do they allege that the limitations on Billy's religious and political speech occurred <u>as a result</u> of that policy, practice, or custom. Thus, Count Four is dismissed without prejudice.

2. <u>Deliberate Indifference Policy, Practice, Custom (Count Five)</u>

In Count Five, Plaintiffs claim that Defendants established and maintained with "deliberate indifference" to the consequences of acts/omissions, a "policy, practice and/or custom" of "failing to take appropriate action" regarding complaints of bullying; the existence of a hostile educational environment; intimidation, harassment and/or hostile behavior by fellow students; supervision and safety of the students in their care and custody; and/or the training of their staff. (Compl., ¶ 129.)

As stated above, the Manasquan Defendants may not be held liable for a constitutional violation under *respondeat superior*. *C.H. v. Oliva*, 226 F.3d 198, 202 (3d Cir. 2000). Rather, a school board may be "held responsible for a constitutional violation of a [school administrator] only if the violation is a result of a policy, custom or practice established or approved by the board." *Monell*, 436 U.S. at 658; *C.H.*, 226 F.3d at 202. A plaintiff must plead the violation of a specific constitutional right to hold a municipality liable under a *Monell* deliberate-indifference theory. *See Gayemen v. Sch. Dist. of the City of Allentown*, No. 14-1518, 2016 WL 3014896, at *12 (E.D. Pa. May 26, 2016), *aff'd sub nom. Gayemen v. Sch. Dist. of City of Allentown*, 712 Fed. Appx. 218 (3d Cir. 2017) (holding that a plaintiff asserting a *Monell* claim must plead an underlying constitutional violation); *see also Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016) ("To hold the school district liable for a failure to train under Section 1983, appellants must demonstrate <u>that there was a constitutional violation</u> and that the violation was

caused by the school district's policy or custom.") (emphasis added) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996)).

In the instant case, Plaintiffs generally allege that Defendants' deliberate indifference to bullying and harassment resulted in the deprivation of Billy's constitutional rights. On this motion, Defendants argue that Plaintiffs have "failed to show that a person acting under color of state law engaged in conduct that violated a right protected by the United States Constitution or laws." (Def. Mov. Br., 19.) Despite Defendants' arguments in this regard, however, Plaintiffs do not squarely address the specific constitutional violation that underlies their *Monell* claim. As such, the Court assumes, based on the general allegations of the Complaint, that Plaintiffs assert Defendants' deliberate indifference caused violations of Billy's constitutional right to bodily integrity under the Due Process Clause of the Fourteenth Amendment of the Constitution.

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. The right to bodily integrity is protected by the substantive component of the Due Process Clause. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) ("Individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment.") (citing *D.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1368 (3d Cir. 1992)).

"But as the Supreme Court has explained, 'nothing in the language of the Due Process Clause itself requires the State to protect life, liberty, and property of its citizens against invasions by private actors.' " *Gayemen*, 712 F. App'x at 220 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). In *DeShaney*, the Supreme Court held that "[a]s a general

matter ... a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197.

Rather, the purpose of the Due Process Clause is to "protect people from the State, not to ensure that the State protect[s] [the people] from each other." *Gayemen*, 712 F. App'x at 220 (citing *DeShaney*, 489 U.S. at 197). The Due Process Clause functions as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. *DeShaney*, 489 U.S. at 195 (citing *Davidson v. Cannon*, 474 U.S. 344, 348 (1986); *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

As Plaintiffs concede in their opposition, "[c]ourts within the Third Circuit have confronted *Monell* claims in the context of student-on-student school bullying and have consistently found that the plaintiffs failed to allege the violation of a constitutional right."[3] *Lansberry v. Altoona Area Sch. Dist.*, 356 F. Supp. 3d 486, 500 (W.D. Pa. 2018); *see Mohammed ex rel. Mohammed v. Sch. Dist. of Phila.*, 355 F.Supp.2d 779, 787 (E.D. Pa. 2005) ("Because the School District and its employees did not create the danger that resulted in Richard's harm, any failure to protect Richard from the misguided punch was not an infringement on his constitutional rights."); *DeWitt v. Del. Valley Sch. Dist.*, No. 10-1836, 2011 WL 3033361, at *3 (M.D. Pa. July 25, 2011) (dismissing

---

[3]      Courts within other circuits have reached the same conclusion when considering *Monell* claims involving student-on-student bullying. *See Hill v. Blount Cty. Bd. of Educ.*, 203 F.Supp.3d 871, 885 (E.D. Tenn. 2016) (dismissing *Monell* claim brought by students who alleged racial harassment because "the school's failure to stop third parties from harassing plaintiffs does not rise to the level of a constitutional violation"); *Mohat v. Mentor Exempted Village Sch. Dist. Bd. of Educ.*, No. 09-688, 2011 WL 2174671, at *8 (N.D. Ohio June 1, 2011) (holding that "the school's failure to stop third parties from harming Eric (in this case the bullies, and/or Eric, himself), although tragic and possibly preventable, does not rise to the level of a constitutional violation"); *Vidovic v. Mentor City Sch. Dist.*, 921 F.Supp.2d 775, 798 (N.D. Ohio 2013) (holding that plaintiffs' *Monell* claim failed because "Plaintiffs have not provided any evidence that could establish the violation of any constitutional right owed to them or their daughter"); *Doe v. Dallas Indep. Sch. Dist.*, 194 F.Supp.3d 551, 567 (N.D. Tex. 2016) (holding that school could not be held liable under *Monell* for teacher's aide's failure to prevent student-on-student sexual harassment); *Dorsey v. Pueblo Sch. Dist. 60*, 140 F.Supp.3d 1102, 1119 (D. Colo. 2015) (dismissing *Monell* claim against school bully and municipal defendants "because Plaintiff cannot establish an underlying constitutional violation").

plaintiff's *Monell* claim "[b]ecause the Court finds no constitutional violation" in a case where a teacher failed to prevent one student from attacking another); *Magwood v. French*, 478 F.Supp.2d 821, 831-32 (W.D. Pa. 2007) (dismissing the plaintiff's *Monell* claim because the plaintiff-student's harm was not caused by a constitutional violation by a district official); *D.M. by Sottosanti-Mack v. Easton Area Sch. Dist.*, No. 17-1553, 2017 WL 6557560, at *8 (E.D. Pa. Dec. 22, 2017) (finding that a school's alleged lack of security policies was insufficient to establish a constitutional violation where one student stabbed another with a pencil); *Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 66 F.Supp.3d 570, 585-88 (M.D. Pa. 2014), *aff'd* 644 F. App'x 172, 178 (3d Cir. 2016) ("Appellants cannot recover under Section 1983 for failure to train because there was no underlying constitutional violation.").

More specifically, the Third Circuit has held that there was no constitutional violation where a plaintiff brought a *Monell* claim against a school district for failing to prevent student-on-student bullying. In *Bridges*, a fourth-grade student, D.B., was persistently bullied by his classmates. *Bridges*, 644 F. App'x at 174. In that case, the plaintiffs, which consisted of the student and his parents, brought a § 1983 *Monell* claim alleging that the school district failed to train its employees to avoid constitutional violations. *Id.* at 178. The plaintiffs alleged that other students physically attacked D.B. and injured him on multiple occasions. *Id.* at 174. Plaintiffs also alleged that D.B.'s teacher was notified of the bullying, that she failed to act to reconcile the bullying, and that the teacher herself verbally abused D.B. *Id.* at 176. In their *Monell* claim, the plaintiffs alleged that "D.B. was deprived of his liberty interest and right to bodily integrity as a result of the student-on-student bullying in the first grade." *Id.* at 176. The district court granted summary judgment in favor of the school district because the plaintiff did not properly allege a constitutional violation. *See Bridges*, 66 F.Supp.3d at 585-88. On appeal, the Third Circuit affirmed. *Bridges*, 644 F. App'x

at 178. The Third Circuit held that plaintiffs' "Fourteenth Amendment claims are ultimately foreclosed by this Court's [*en banc*] decision in *Morrow v. Balaski*, 719 F.3d 160 (3d Cir. 2013)." *Id.* at 174. In *Morrow*, the Third Circuit held that "public schools, as a general matter, do not have a constitutional duty to protect students from private actors," including other students. *Id.* at 170. Although *Morrow* did not involve a *Monell* claim, the Third Circuit in *Bridges* held that its *en banc* decision in *Morrow* precluded the plaintiffs in *Bridges* from pleading the requisite constitutional violation. *Id.*

Further, the court's decision in *Lansberry* is also persuasive. 356 F. Supp. 3d at 500. In that case, the father of a male junior high school student, W.J.L., who committed suicide following "intense, persistent and malicious bullying" by other students brought an action against the public school district and school district officials. *Id.* at 489. In support of his claim under § 1983, the plaintiff alleged that school officials were deliberately indifferent to his son's right to bodily integrity by failing to prevent other students from bullying W.J.L. *Id.* at 502. Based on the Third Circuit precedent above, however, the court granted the defendants' motion to dismiss the plaintiff's *Monell* claim, concluding that the plaintiff's second amended complaint did not sufficiently allege the violation of a constitutional right. *Id.* In dismissing this claim, the court recognized that the bullying alleged in the plaintiff's pleading was "appalling and that it created a truly dreadful experience" for the student. *Id.* The court further recognized that school bullying is a "pervasive problem nationally" and that failures by school officials to stop the bullying "allowed a toxic bullying environment to flourish." *Id.* That said, however, the court reasoned that

> [H]arm caused by student-on-student bullying is not a constitutional harm that *Monell* protects against. Regardless their obligations under school policy and the common sense proposition and public expectation that school officials should keep students safe from known risks, AASD officials had no recognized constitutional obligation to protect W.J.L. from his peers. The Fourteenth Amendment right to

bodily integrity protects individuals against harm caused by state actors, and not
harm caused by third parties.

*Id.* at 503. In addition, the court noted that "because at least some of the bullying occurred after

school and through electronic means, it is not clear that AASD officials would have been able to

prevent the bullying completely, even if they had exercised extreme diligence in enforcing Altoona

Junior High School's anti-bullying policy." *Id.*

Here, the Court similarly finds that dismissal of Plaintiffs' *Monell* claim is warranted

because the Complaint fails to allege violation of a constitutional harm that *Monell* protects

against. The allegations are clear that Plaintiff's alleged violation of constitutional rights in Count

Five is premised on the actions of students, not direct action by a governmental employee or a

policy, custom or any "deliberate indifference" of the Manasquan Defendants. Indeed, the

Complaint alleges that the ongoing discrimination against Billy, including the bullying, assaults,

and threats against him, were a direct and proximate result of Defendants' failure to "properly

protect students within their supervisory control;" "supervise students;" "prevent, investigate,

and/or take reasonable steps to eradicate acts of discrimination and harassment against students;"

"investigate allegations of bullying, intimidation, harassment, and/or physical abuse of students;"

"take appropriate measures in response to allegations of bullying, intimidation, harassment, and/or

physical abuse of students;" "ensure that victims of bullying and their families would not be

retaliated against when seeking services and assistance;" "provide regular and continuous

observation and supervision and/or control of Plaintiff's activities;" "provide regular and

continuous observation and supervision and/or control of the tormentors of Plaintiff;" "supervise,

handle, and control harassing, discriminatory, and aggressive students;" and "protect Plaintiff."

(Compl., ¶ 130.) In addition, the Complaint alleges that Defendants' deliberate indifference

consisted of the "creation of, toleration of, and acquiescence in a school environment in which

discrimination, bullying, intimidation, harassment, and hostile behavior against students, as Billy Roe experienced, was never adequately addressed." (*Id.*)

Like the court in *Lansberry*, the Court, here, is sympathetic to the incidents of bullying alleged in the Complaint; however, the case law is well-settled—bullied students and their families cannot hold a school accountable under § 1983 for a failure to protect students and keep a safe environment because there is no underlying constitutional violation. Further, to the extent that Plaintiffs argue that Count Five should not be dismissed because they have also alleged direct physical violence and non-physical harassment and intimidation directed at Billy by several of the Individual Defendants, *i.e.*, Mr. McCann, Ms. Savage, and Mr. Kirk; and Defendants have acted with deliberate indifference to the violations of Billy's First Amendment rights, the Court is unpersuaded. First, this is simply not what Count Five alleges. Rather, Plaintiffs' *Monell* claim asserted in Count Five relates only to harm resulting from numerous alleged "failures" by Defendants to protect Billy from other students. (*See* Compl. ¶¶ 129-32.) Second, even when considering this argument substantively, the Complaint lacks any facts to support a *Monell* theory for a policy, practice or custom of allegedly condoning teacher misconduct—either as it relates to physical abuse and harassment or violation of Billy's First Amendment rights. Indeed, the Complaint contains no factual allegations that a policymaker had actual knowledge of similar behavior in the past and acquiesced to it. Rather, the Complaint contains various allegations of misconduct by certain teachers and staff without any indication that these incidents were reported to any policymaker of the Manasquan Board of Education. (*See* Compl. ¶¶ 32A – G, ¶ 40.)

Accordingly, Count Five is dismissed without prejudice.

26

### 3. State-Created Danger (Count Six)

Plaintiffs' last theory of liability under § 1983 is state-created danger. "As a general rule, there is no affirmative right to governmental protection under the Due Process Clause of the Fourteenth Amendment." *Bilbili v. Klein*, 249 F. App'x 284, 287 (3d Cir. 2007) (citing *DeShaney*, 489 U.S. at 195). The state-created danger doctrine is a "narrow exception to the general rule that the state has no duty to protect its citizens from private harms." *Henry v. City of Erie*, 728 F.3d 275, 286 (3d Cir. 2013). Under this exception, a "plaintiff can allege a substantive due process violation under § 1983 by showing that the harm suffered at the hands of third parties was a direct result of state action. *Bilbili*, 249 F. App'x at 287 (citing *Kneipp*, 95 F.3d at 1208–09).

To state a claim for state-created danger, a plaintiff must meet the following elements:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Doe v. Small*, No. 21-11189, 2023 WL 1750405, at *8 (D.N.J. Feb. 2, 2023) (citing *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006)) (citations and quotations omitted). "It is important to stress ... that under the fourth element ... '[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.' " *Id.* (quoting *D.R. by L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364, 1374 (3d Cir. 1992)).

Here, the Court, like the parties,[4] concentrates its analysis on the fourth element required to assert a claim for state-created danger—whether a state actor affirmatively used his or her authority in a way that created a danger to Billy or that rendered Billy more vulnerable to danger than had the state not acted at all. Importantly, "to satisfy the fourth element of the state created danger test, a plaintiff must 'allege an affirmative action rather than inaction or omission.' " *L. H. v. Pittston Area Sch. Dist.*, 666 Fed. Appx. 213, 217 (3d Cir. 2016) (quoting *Bright*, 443 F.3d at 282). In that regard, the Court agrees that to the extent Plaintiffs rely on allegations that Defendants failed to investigate and act on reports of peer bullying and harassment, that type of inaction is insufficient to sustain the state-created danger claim. The Third Circuit has been clear in analogous cases that such alleged failures are insufficient. *See id.* (concluding that the school district and superintendent's alleged failure to train, supervise, and monitor a teacher did not satisfy the fourth element of the state-created danger test); *Morrow*, 719 F.3d at 178 (holding that suspending rather than expelling a student – potentially in violation of a disciplinary policy – did not constitute an affirmative act); *Brown v. Sch. Dist. of Philadelphia*, 456 Fed. Appx. 88, 91 (3d Cir. 2011) (finding that the district's promise – and later failure – to provide one-on-one supervision was not an affirmative act).

That said, the Court disagrees with Defendants that the Complaint contains no allegations of affirmative action capable of satisfying the fourth element of state-created danger. Specifically, the Complaint alleges actions by Mr. McCann, Ms. Savage, and Mr. Kirk that the Court finds sufficient to satisfy the elements required to state a claim for state-created danger. For example, the Complaint alleges that in 2016, when Billy was playing with a toy in the lunchroom, Mr. McCann "stormed over to Plaintiff and grabbed both of his wrists and shook them until the toy fell

---

[4]     The Court notes that Defendants do not challenge the other three elements required to state a claim for state-created danger.

out of Plaintiff's hand and onto the floor." According to Plaintiffs, C.W. and K.W. complained about the incident but the Manasquan Defendants took no action. The Complaint further alleges that Mr. McCann "spent most of the days watching Plaintiff Billy Roe and writing down, in a little black notebook, every move [Billy] made throughout the school day." According to Plaintiffs, Mr. McCann also used a "clicker" to document each time he believed Billy was doing something wrong. Plaintiffs allege that "between the 'check marks' and 'clicker', Plaintiff Billy Roe felt he was under a microscope, and it felt hostile." Plaintiffs further allege that Billy was eventually removed from Mr. McCann's fifth grade class after Mr. McCann was "4 inches from Billy Roe's face screaming at him." As for Ms. Savage, the Complaint alleges that following an argument involving another student, Billy refused to speak with school staff about the incident until his parents were present. As a result, Plaintiffs allege that Ms. Savage, "blocked the door so Billy Roe could not leave and told Billy Roe he could not go to the bathroom or get a drink of water unless he first talked to the CST people about the incident." Similarly, the Complaint alleges that Mr. Kirk told Billy that he was only allowed to use the bathroom twice per day.

Accordingly, based on these allegations, the Court denies Defendants' motion as to Count Six.

### D.     Punitive Damages

Finally, Defendants move to strike Plaintiffs' request for punitive damages. Because the Manasquan Defendants are immune from punitive damages under N.J. Stat. Ann. § 59:9–2(c), the Court finds that Plaintiffs are not entitled to punitive damages against those public defendants in connection with their claims for negligence and violations of § 1983. *See M.K. ex rel. D.K. v. Hillsdale Bd. of Educ.*, No. 06-1438, 2006 WL 2067177, at *4 (D.N.J. July 20, 2006) (conceded by plaintiff that school and board of education were immune from punitive damages under N.J.

Stat. Ann. § 59:9–2(c)); *Dennis v. Bd. of Educ. of S. Orange-Maplewood*, No. 04-1218, 2006 WL 8457607, at *14 (D.N.J. Aug. 28, 2006) ("It is clear under the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981) that the Plaintiffs are not entitled to punitive damages from the Board on their federal claims under 42 U.S.C. § 1983.").

As for any remaining claims against the Manasquan Defendants arising under the NJLAD, however, the Third Circuit has found that public entities are not immune from punitive damages. *See Gares v. Willingboro Twp.*, 90 F.3d 720, 730 (3d Cir. 1996) ("Given the plain language, legislative history and purpose of the LAD, and considering the New Jersey courts' interpretations of the LAD and CEPA, we predict that the Supreme Court of New Jersey would hold that the LAD permits the recovery of punitive damages against public entities."). Here, the Court finds that dismissal of Plaintiffs' request for punitive damages in connection with those claims is premature at this early stage of the litigation. *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F.Supp.2d 494, 512 (D.N.J. 1999) (denying motion to dismiss non-barred punitive damages claims as premature); *Domm v. Jersey Printing Co.*, 871 F.Supp. 732, 739 (D.N.J. 1994) (denying motion for summary judgment on punitive damages as premature because "issue of punitive damages is a fact question which should be decided by a jury"); *Zhenping Cheng v. One World Techs., Inc.*, No. 13-01210, 2013 WL 5773856, at *2 (D.N.J. Oct. 23, 2013) (finding dismissal of plaintiff's punitive damages claim premature on motion to dismiss). Similarly, the Individual Defendants are also not immune from punitive damages, and therefore, the Court declines to strike Plaintiffs' request at this juncture.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' partial motion to dismiss the Complaint is **GRANTED** in part and **DENIED** in part. With respect to Plaintiffs' negligence claim (Count

One), Defendants' motion is granted as to Mr. Cattani, Dr. Kasyan, Ms. Polak, and Mr. Roach, but denied as to Ms. Savage. As to Plaintiffs' hostile educational environment claim under the NJLAD (Count Two), Defendants' motion is granted as to the Individual Defendants, but denied as to the Manasquan Defendants. Defendants' motion is also granted as to Plaintiffs' retaliation claim under the NJLAD (Count Three). Finally, Defendants' motion is granted as to Plaintiffs' claim for violation of Billy's First Amendment rights under § 1983 and *Monell* claim (Count Five), but it is denied as to Plaintiffs' claim for state-created danger (Count Six).

As for Defendants' request to strike punitive damages from the Complaint, that request is granted as to the Manasquan Defendants, except for as those damages relate to Plaintiffs' NJLAD claims. Defendants' request to strike punitive damages is also denied as to the Individual Defendants.

Plaintiffs are given leave to amend their Complaint within 30 days from the date of the accompanying Order, consistent with this Opinion.

Dated: February 28, 2023        */s/ Georgette Castner*
                                              Georgette Castner
                                              U.S. District Judge